[851 NYS2d 406]

Dennis Bellamy, Respondent, v Columbia University, Appellant.

First Department, January 31, 2008

APPEARANCES OF COUNSEL

*Rivkin Radler LLP*, Uniondale (*Cheryl F. Korman* and *Evan H. Krinick* of counsel), for appellant.

*Quaranta & Associates*, Mount Kisco (*Kevin J. Quaranta* and *Virginia D. Mallon* of counsel), for respondent.

**OPINION OF THE COURT**

LIPPMAN, P.J.

Plaintiff alleges that he sustained injuries when, while temporarily assigned by his employer, Troy Associates, a temporary employment agency, to work in one of defendant University's kitchens, he slipped on a wet, greasy substance that had been permitted to remain on the kitchen floor. It is undisputed that at the time of the accident Troy was plaintiff's employer; it paid plaintiff's salary and benefits, including workers' compensation, determined which of its clients plaintiff was to report to as well as the duration of any such assignment, monitored plaintiff's performance, and retained the exclusive right to discharge him. Nonetheless, it is defendant's contention that plaintiff became its special employee when, the day preceding the accident, he reported for work, was handed a university food service uniform and directed to his kitchen work station. Indeed, it is defendant's contention that plaintiff's special employee status at the time of the accident is made out as a matter of law and, accordingly, that it is entitled to summary judgment dismissing the complaint as barred by the exclusive remedy provisions of Workers' Compensation Law §§ 11 and 29 (6).

It is, of course, true that an employee, although generally employed by one employer, may be specially employed by another employer, and that a special employer may avail itself of the Workers' Compensation Law to bar negligence claims against it for injuries sustained by a special employee in the course of special employment. General employment is, however, presumed to continue, and special employment will not be found absent a "clear demonstration of surrender of control by the general employer and assumption of control by the special employer" (*Thompson v Grumman Aerospace Corp.*, 78 NY2d 553, 557 [1991]). Whether such a complete transfer of control

has occurred is ordinarily a fact-sensitive inquiry not amenable to resolution on summary judgment (*id.*). Only where the defendant is able to demonstrate conclusively that it has assumed exclusive control over "the manner, details and ultimate result of the employee's work" (*id.* at 558) is summary adjudication of special employment status and consequent dismissal of an action proper.

While we have in recent cases involving temporary employment awarded summary judgment upon finding that a special employment relationship was made out as a matter of law (*see Villanueva v Southeast Grand St. Guild Hous. Dev. Fund Co., Inc.*, 37 AD3d 155 [2007]; *Suarez v Food Emporium, Inc.*, 16 AD3d 152 [2005]), these were cases in which the defendant's direct control over the plaintiff's work was essentially admitted. In *Villanueva*, the plaintiff, a building painter, testified that he was supervised in the performance of his painting duties by the building superintendent, who was, pursuant to a contract of record, an employee of the defendant special employer (37 AD3d at 156-157); and in *Suarez* the plaintiff admitted that "either the deli manager or the chef of [the defendant] Food Emporium directed him to report to work on a particular day and the deli manager gave him orders" (16 AD3d at 153). Here, by contrast, there exists neither admission nor other evidence permitting the legal conclusion that there existed a special employment relation.[1] As noted, the decisions as to where plaintiff was to work from day to day were made not by the putative special employer, Columbia, but by the general employer, Troy. Nor does the record establish that once plaintiff reported to work at Columbia he was treated from a supervisory standpoint as a Columbia employee. The only witness produced by defendant to testify as to its supervision of plaintiff, a sous-chef named McMillian, when asked if he recalled what plaintiff's duties had been, stated: "For that day he was a temp. No I don't—I can't. I don't recall if we called him in as a temp what he was doing." Indeed, so far as can be discerned from the record, plaintiff, an experienced food preparer, was left essentially unsupervised as he went about his tasks in defendant's kitchen; his testimony to the effect that no one from Columbia told him how to do his job or supervised him stands uncontradicted. Plainly, this record, in distinction to the records presented in *Villanueva* and *Suarez*,

---

**1.** The dissent's insistence that we suggest a rule that a finding of special employment on summary judgment must be premised on a plaintiff's admissions reflects a misconstruction of this sentence.

does not permit the inference that defendant did in fact assume control over "the *manner, details* and *ultimate result*" of plaintiff's work *(Thompson,* 78 NY2d at 558 [emphasis added]). To the contrary, it more persuasively supports the inference that defendant sought the services of an experienced temp such as plaintiff precisely because it did not wish to have to supervise the "manner, details and ultimate result" of the temp's work as it would an employee's, and could, if it were dissatisfied, simply ask the temp's employer for a replacement.

In any event, there is at the very least a triable issue as to whether there was a sufficient transfer of control to justify the conclusion that plaintiff became defendant's special employee. It is appropriate to emphasize in this connection that it is not sufficient for the proponent of special employment to show a mere cession by the general employer of some measure of control; the cession must be shown to have been complete, and concomitant with the proponent's complementary assumption of control. Thus, in *Thompson,* special employment was established where "combined with other indicia of special employment, the uncontroverted record document[ed] [the special] employer's *comprehensive and exclusive daily control over and direction of the special employee's work duties*" (78 NY2d at 557 [emphasis added]). No remotely comparable showing has been made here *(cf. Lane v Fisher Park Lane Co.,* 276 AD2d 136, 139-140 [2000] [special employment made out where plaintiff "(f)or about one month before the accident . . . was assigned, on a daily, full-time basis, to the same department, where she worked exclusively for two individuals, whom she considered her 'bosses' "]; *Hanchett v Graphic Techniques,* 243 AD2d 942, 944 [1997] [special employment made out where employee testified that he "worked directly" for a supervisor in the employ of the special employer, worked on projects as part of "a team" with employees of the special employer, some of whom dictated the "ultimate result," and where there was testimony establishing that the special employer "retained complete control over (the putative employee), including the right to fire him or lay him off as (it) saw fit"]).

While the underlying factual predicate for the finding of special employment is not set forth in all of the decisions upon which the dissent relies *(see Roberson v Moveway Transfer & Stor.,* 44 AD3d 839 [2007]; *Bailey v Montefiore Med. Ctr.,* 12 AD3d 545 [2004]; *Dyer v We're Assoc.,* 289 AD2d 137 [2001]; *Maldonado v Canac Intl.,* 258 AD2d 415 [1999]; *Causewell v*

*Barnes & Noble Bookstores,* 238 AD2d 536 [1997]), there is no cited case in which the discernible basis for a finding of special employment is as tenuous as that afforded by the record at bar. The testimony relied upon by the dissent simply does not permit the legal conclusion that plaintiff, in effect, became defendant's employee. Dellos Scott, Troy's vice-president, although able to testify as to the degree of control relinquished by Troy, manifestly had no basis to testify as to the level of control actually exercised over plaintiff by defendant.[2] And, while the dissent makes much of plaintiff's testimony that he was told what job to do, being told what job to do does not suffice to demonstrate the existence of a special employment relation; independent contractors and their employees are routinely instructed as to what they should do by those purchasing their services, but do not therefore become the purchasers' employees.[3] Nor is plaintiff's testimony that he was provided with a uniform highly probative. Rather, what the law requires is a showing of actual control by the party claiming special employer status over the "manner," "details" and "ultimate result" of the work of the alleged special employee, i.e., that there was between the employer and putative employee "a working relationship. . . sufficient in kind and degree" to justify deeming the defendant the plaintiff's employer (*Fung v Japan Airlines Co., Ltd.,* 9 NY3d 351, 359 [2007]). Yet, here, notwithstanding the dissent's extensive cullings from the record and allusion to "uncontroverted evidence of the circumstances of plaintiff's employment," there is no evidence affirmatively establishing that defendant did in fact supervise plaintiff as it would have supervised an employee. Indeed, defendant's only supervisory witness identified plaintiff, albeit tentatively, not as an employee, but as a temp, and was completely unable to recall what plaintiff had done while working upon defendant's premises. Nor was the resulting evidentiary gap closed by plaintiff's testimony that there were occasionally Columbia "spotters" in the kitchen,

**2.** In light of the dissent's repeated assertion that Troy was utterly absent from defendant's premises and uninvolved with plaintiff's work there, it is curious that it should rely upon Troy's principal to detail the relevant circumstances of plaintiff's work in defendant's kitchen.

**3.** The point here is not that plaintiff was an independent contractor, but simply that the giving and taking of directions is not necessarily indicative of an employer-employee relation. Plaintiff, of course, had no burden to establish the precise nature of his relationship to defendant; it was rather defendant's burden to establish that plaintiff was, in essence, its employee, and that burden was not carried simply by evidence that the plaintiff was given a uniform and directed to a work station.

since plaintiff explicitly stated in testimony, the credibility of which is not properly at issue in this procedural context, that he was left unsupervised.

While it may be tempting to infer from the general employer's surrender of control a corresponding assumption of control by the putative special employer, the law is clear that a showing of the former does not suffice to support an inference of the latter. As noted, there must, in addition, be an affirmative showing that complete and exclusive control has in fact been assumed (*see Fung*, 9 NY3d at 359; *Thompson*, 78 NY2d at 557, 559).[4] Here, not even the evidence of the general employer's surrender of control is conclusive, the general employer having retained the right to assign plaintiff to "customers" (*see Short v Durez Div.-Hooker Chems. & Plastic Corp.*, 280 AD2d 972, 972 [2001]; *cf. Thompson*, 78 NY2d at 559), monitor his performance, and terminate him (*cf. Hanchett*, 243 AD2d at 944). As the general employer's vice-president put it: "We would do the discharging. The client . . . I mean, *the guys worked for us*" (emphasis added).

Although the dissent, quoting *Suarez* (16 AD3d at 154), perceives no reason to afford plaintiff "any greater rights to sue [defendant] than all those other employees who equally work under its control," the quote assumes a set of affairs completely unsupported by this record. There is scant proof before us as to the degree of control exercised by defendant over plaintiff's work and none as to how defendant's supervision of plaintiff compared to its supervision of its employees.[5] The notion, then, that plaintiff's action reflects an unjust expectation, a desire to be treated differently than those similarly situated, is at the

4. We perceive no basis to excuse such a showing in cases where the general employer is a temporary employment agency. Certainly, permission for such a dispensation is not to be found in any Court of Appeals decision. Indeed, that Court has expressly rejected a claim of special employment made as to workers obtained by the putative special employer from a temporary employment agency where a sufficient showing of actual control by the putative special employer was not made (*Bynog v Cipriani Group*, 1 NY3d 193, 200 [2003]).

5. Contrary to the dissent, we do not "speculat[e]" that Columbia may not have supervised plaintiff as it did its general employees. We simply observe that the record affords no basis to conclude as a matter of law that plaintiff was, in fact, treated from a supervisory standpoint as a Columbia employee. Although the dissent appears to suggest that plaintiff has some burden to demonstrate a disparity in treatment, it is rather defendant's essential burden in demonstrating its entitlement to the Workers' Compensation Law defense to show parity, i.e., that plaintiff was in fact treated by defendant as it would have treated one of its own similarly situated general employees.

very least premature. One might with greater justification question defendant's expectation that it should be deemed plaintiff's employer and thus shielded from all liability in this matter. So far as can be told from this record, defendant did not hire or even screen plaintiff and did not train him. It did not pay his salary or benefits, and supervised him only minimally, relying upon plaintiff's employer, Troy, which retained the power to terminate and reassign plaintiff, to rectify any significant dissatisfaction it may have had with the services plaintiff had been dispatched by Troy to provide. Rather than assume the responsibilities of an employer, defendant, Troy's "customer," seems to have simply filled a temporary need by purchasing from Troy the services of a trained food preparer. It does not seem probable that there was any contemporaneous expectation, justifiable or otherwise, that this arrangement would give rise to an employment relation. Indeed, the possible existence of such a relation and consequent availability of a workers' compensation defense apparently did not dawn on defendant until significantly after the action was commenced, a gap of some 15 months having intervened between the service of the complaint and defendant's motion for leave to amend its answer to include the defense. Certainly, the delay cannot be attributed to lack of discovery, for defendant could have required no discovery to allege facts supporting the existence of a special employment relationship; such facts, to the extent they existed, were undoubtedly in defendant's possession from before the action's inception.

In light of defendant's apparently long oblivion respecting the existence of the alleged special employee relationship, there must be at least a factual question as to whether the lately alleged relationship was one of which plaintiff was aware and to which he consented (*see Thompson*, 78 NY2d at 558-559; *Murray v Union Ry. Co. of N.Y. City*, 229 NY 110, 112-113 [1920]; *Short v Durez Div.-Hooker Chems. & Plastic Corp.*, 280 AD2d 972 [2001]).

> "[E]mployment, like any other contract, presupposes understanding. The new relation cannot be thrust upon the servant without knowledge or consent. He must understand that he is submitting himself to the control of a new master . . . Understanding may be inferred from circumstances, but understanding there must be. *Common-law rights and remedies are not lost by stumbling unawares into a new contractual relation.* There can be no

unwitting transfer from one service to another" (*Murray* at 113 [Cardozo, J.] [emphasis added and citations omitted]).

The dissent, a trifle sententiously, expresses the view that the failure to find a special employment relation on this record would "abrogate a settled legal principle." However, the "settled legal principle" that would be abrogated by a denial of summary judgment in this case is far from evident. Indeed, the Court of Appeals has consistently reaffirmed the settled legal principle that the presumption of continuing general employment may not be overcome except upon a "clear demonstration of surrender of control by the general employer *and* assumption of control by the special employer" (*Thompson*, 78 NY2d at 557 [emphasis added]), and has only recently, in reversing a grant of summary judgment predicated upon a finding of special employment, had occasion to emphasize that the "[e]ssential" factor justifying a finding of special employment "is a working relationship with the injured plaintiff sufficient in kind and degree so that the third party . . . may be deemed plaintiff's employer" (*Fung*, 9 NY3d at 359). Notably, the Court in *Fung* refused to infer such a relationship from the title of the purported employer, and instead insisted upon evidence of an "actual working relationship between [the putative employer] and the purported 'employee' " (*id.* at 360). Here, as in *Fung,* the proponent of special employment has stopped "conspicuously short of explaining its working relationship with [the purported special employee]" (*id.*). Thus, while the dissent dismisses as insignificant McMillian's complete lack of recollection as to his purported "supervision" of plaintiff and may instead find it "important" that McMillian identified himself as plaintiff's "supervisor," its reliance upon title to support the inference of an employment relationship merely replicates an approach to proving special employment specifically rejected in *Fung*.

The very significant evidentiary hurdle that must be cleared to establish an employment relation as a matter of law has, of course, not always been fully appreciated. In *Bynog v Cipriani Group* (298 AD2d 164 [2002], *mod* 1 NY3d 193 [2003]), for example, this Court held that the plaintiffs, waiters provided to the defendant restaurateurs on a temporary basis to supplement their permanent waiting staff, possessed viable Labor Law §§ 191 and 198 claims for compensation from the defendants in light of evidence supporting the inference that the plaintiffs were the defendants' "employees." We noted in this connection

that the plaintiffs were required "to adhere to strict guidelines on how and when to serve food and set tables, wear uniforms, including a pin identifying them as respondents' [Cipriani's] employees, and perform the same functions as respondents' own permanent, unionized [employees], to whom plaintiffs reported" (298 AD2d at 164). The Court of Appeals, however, granted summary judgment dismissing the section 191 and 198 claims upon the ground that the plaintiffs, as a matter of law, were not the defendants' employees, and specifically found that "the Ciprianis did not exert sufficient control over plaintiffs' performance of their work to render them the special employer of plaintiffs" (1 NY3d at 200, citing *Thompson*, 78 NY2d at 557). While it is true that there was in *Bynog* evidence that the putative general employer retained a greater measure of control over the putative employees than appears to have been retained by Troy here, the nature of the actual working relationship between the *Bynog* plaintiffs and their putative employer did not differ materially from that of the actual working relationship between plaintiff and defendant, at least to the extent that that latter relationship is discernable from the present record. Like the plaintiffs in *Bynog*, plaintiff was interviewed, hired and compensated by his general employer and was dispatched by that employer to the employer's "client" to temporarily augment the client's regular workforce by providing, on a day-to-day basis, a clearly defined service for which he had been previously trained. Like the *Bynog* plaintiffs, plaintiff was required to wear a uniform and a pin identifying him as a provider of services on defendant's behalf and was directed by the client generally as to what he should do. And, like the *Bynog* plaintiffs, he worked side by side with, and undoubtedly performed many of the same tasks as, the putative employer's permanent food service employees. It is, nonetheless, clear from *Bynog* that none of this sufficed to transform plaintiff into defendant's employee. What was missing in *Bynog,* and was absent from defendant's showing in support of its present motion, was evidence of an "actual working relationship" "sufficient in kind and degree" (*Fung,* 9 NY3d at 360, 359) to show that the putative employer had come to exercise complete control over "all essential, locational and commonly recognizable components of the work relationship" (*Thompson*, 78 NY2d at 558). As noted, the locational prerogative was evidently retained by plaintiff's employer, Troy (*cf. id.* at 559), and defendant wholly failed to adduce evidence of anything remotely resembling an actual work

relationship in which plaintiff was directly answerable to and supervised by defendant in the details of his work.

Decisions passing upon motions seeking summary adjudication of special employment routinely recite, as indeed the dissent has, that, ordinarily, the existence of a special employment relationship turns on the resolution of factual issues properly left for trial. While there are, of course, cases in which a finding of special employment may be made on summary judgment, the highly fact-sensitive nature of the issue, combined with the presumption that general employment continues and the formidable burden placed on a summary judgment movant to demonstrate the absence of any triable issue of fact, militate against summary adjudication. Circumspection is also appropriate since a finding of special employment may function to deprive an injured plaintiff of a common-law remedy for negligence based on a categorization having nothing to do with the merits of the plaintiff's claim (see Murray, 229 NY at 113). Viewed in this context, but particularly in light of the very equivocal evidence of the alleged employment relation, it is clear that this is not one of those unusual cases in which special employment may be properly adjudicated on summary judgment (see Thompson, 78 NY2d at 557). Defendant's proof of its assumption of control over "the manner, details and ultimate result" of plaintiff's work simply was not sufficient to permit a legally conclusive inference that plaintiff was aware of and consented to the alleged change in his employment status.

Accordingly, the order of the Supreme Court, Bronx County (Alexander Hunter, J.), entered January 25, 2007, denying defendant's motion for summary judgment dismissing the complaint, should be affirmed, without costs.

MARLOW, J. (dissenting). Defendant Columbia University was a client of nonparty Troy Associates, a temporary staffing company that provided Columbia with food service workers upon request. On October 24, 2002, Troy sent plaintiff Dennis Bellamy to Columbia to work as a cook at a cafeteria for Columbia students. In the course of his work at Columbia that day, plaintiff slipped and fell on a greasy substance on a kitchen floor. Plaintiff subsequently sued Columbia for the injuries he allegedly suffered as a result.

The question on this appeal is whether Columbia is entitled to summary judgment determining that Workers' Compensation Law §§ 11 and § 29 (6) bar this action on the ground that

plaintiff was a special employee of Columbia at the time of the incident. In my view, on this record, Columbia's summary judgment motion should have been granted, because the three witnesses whose depositions appear in the record—Troy's senior vice-president, Columbia's kitchen manager, and plaintiff—all testified that plaintiff worked at Columbia under the direct supervision and control of Columbia, not Troy. In the absence of any countervailing evidence, this establishes, as a matter of law, that a special employment relationship existed between plaintiff and Columbia while he worked there.

While many factors can determine special employment status, "a significant and weighty feature has emerged that focuses on who controls and directs the manner, details and ultimate result of the employee's work" (*Thompson v Grumman Aerospace Corp.*, 78 NY2d 553, 558 [1991]). In analyzing this critical issue, I find the following EBT excerpts particularly relevant and significant.

Dellos Scott, Troy's senior vice-president, gave the following testimony:

> "Q. Who designated the location where Mr. Bellamy was to perform his job?
>
> "A. Liane.
>
> "Q. And that would be Columbia University?
>
> "A. Columbia University.
>
> "Q. Who designated the position that Mr. Bellamy would fill when he was at Columbia University?
>
> "A. The client, Liane Runco. . . .
>
> "Q. . . . In terms of the specifics of how he would be doing deli work [at Columbia], where he would be doing it and what deli he would be doing it in, who would make that designation?
>
> "A. The client, Liane Runco.
>
> "Q. Columbia University?
>
> "A. Right.
>
> "Q. When you sent Mr. Bellamy to Columbia University, did anyone from Troy Associates go to Columbia University?

"A. No.

"Q. Did anyone from Troy direct Mr. Bellamy in terms of how to do his job at Columbia University? . . .

"A. No. . . .

"Q. Did anyone from Troy Associates exercise any control over Mr. Bellamy while he was at Columbia University? . . .

"A. No.

"Q. Did anyone from Troy specify the details of how Mr. Bellamy was to do his job while he was at Columbia University?

"A. No.

"Q. Do you know whether, in October of 2002, Troy sent anyone to the Columbia University dining facility to oversee any of the work[ ] being performed by Troy personnel there? . . .

"A. Troy would not send a, a staff member to oversee our staff at a client location. . . .

"Q. And it would be someone from Columbia who exercised the control over Mr. Bellamy while he's at Columbia, to the extent of telling him where to cook and where to be at any given time; is that correct?

"A. That's correct.

"Q. And Troy would tell him to be at Columbia from, say, eleven a.m. to 4:30 p.m.; correct?

"A. Correct.

"Q. Once Mr. Bellamy's at Columbia, Columbia tells him basically what to do?

"A. Exactly.

"Q. They would tell him what deli mates he should be working with that day, right, or whatever he has to do in the deli?

"A. Yes. . . .

"Q. If he has to cook breakfast food, they'd tell him which breakfast food he had to cook; correct?

"A. Yes.

"Q. They'd give him the menu for the day?

"A. Yes.

"Q. Troy wouldn't do any of that, would they?

"A. No.

"Q. If Mr. Bellamy's cooking was not as good as it should be, would Columbia be the one to make that judgment or would Troy?

"A. Columbia. . . .

"Q. [W]ould you make a joint decision with the client, based upon the feedback you got from the client, as to whether the employee was working out?

"A. That would basically come from the client.

"Q. Now, if any employee was intended to work certain hours, say, from eleven a.m. to four p.m., and that was on printed assignment forms that you produced here today, what would be the procedure if the client needed an employee to work overtime? Would the client call you first, your office?

"A. Generally speaking, he would speak to the— directly to the, uh, employee.

"Q. Would there have to be clearance from Troy before the employee worked overtime, since Troy is the one who's actually paying the employee?

"A. No."

Plaintiff testified as follows:

"Q. So, Columbia gave you your assignment [when you reported there]?

"A. Yes.

"Q. Did Columbia tell you where you were going to be working?

"A. Yes.

"Q. They told you what your job duties would be?

"A. Yes. . . .

"Q. When you were washing dishes [on a prior occasion when you worked at Columbia], was there anyone from Columbia there supervising?

"A. Yes.

"Q. Did they make sure that the dishes got washed correctly?

"A. Make sure of the safety and stuff, yes. . . .

"Q. So, Troy would call you and tell you that Columbia needed someone?

"A. Yes.

"Q. They would send you to Columbia?

"A. Yes.

"Q. Did anyone from Troy ever go to Columbia University in terms of supervising anyone from Troy who was there?

"A. No.

"Q. Once Troy told you to go to Columbia University, it was university people that told you how to do the job and what you were supposed to be doing, is that correct?

"A. Yes. . . .

"Q. Did you have a special uniform that you had to wear in the kitchen?

"A. Every day you got new aprons and hats.

"Q. Who provided the aprons and hats?

"A. Downstairs—the supervisor—I don't know his name—in that office right there outside the kitchen.

"Q. But he's from Columbia?

"A. Yes.

"Q. Besides the apron and hat, did Columbia give you anything else to wear?

"A. Gloves, rubber gloves, and they gave us, I think, a scarf or a pin; you know, a certain dress code they had, uniform dress code.

"Q. So, Columbia set the dress code?

"A. Yes.

"Q. Did they give you any kind of white serving jacket or anything like that?

"A. Yes. They gave us a uniform, the kitchen cafeteria uniform.

"Q. What about pants?

"A. Yes.

"Q. When you got to Columbia, the first day at John Jay [a building] the week before, who told you what job you would have?

"A. Troy told me. Troy told me what I am going for.

"Q. Who told you what station you would be working at?

"A. I forgot her name. She was the manager.

"Q. The manager, was it a Columbia person?

"A. Yes.

"Q. So, Troy told you to go to Columbia, and Columbia told you what job you would do specially?

"A. Yes. You got to listen to the clients, yes.

"Q. Can you describe the manager who you reported to there?

"A. She was a [C]aucasian female. . . .

"Q. Did she tell you that you had to be working at the station that you were working at?

"A. Yes, sir. . . .

"Q. Did Columbia have another supervisor there to watch you cook?

"A. They had a few spotters.

"Q. What would a spotter do?

"A. I wouldn't call them a spotter. I would call them like a supervisor. They make sure everyone knew what they were doing.

"Q. Making sure you knew what you were doing?

"A. Making sure you were doing it right. They weren't breathing down your back though. . . .

"Q. You mentioned a menu. Did Columbia give you a list of foods that you were going to have to cook?

"A. No. They just told me what was at my station. They told me what I was going to have at my station.

"Q. Did they give you a list of ingredients you needed?

"A. No.

"Q. What documents, if any, did Columbia give you, what piece of paper?

"A. They didn't give me any. It was verbal. . . .

"Q. Did anyone from Columbia make sure that your station was cleaned correctly before you left?

"A. No. Well, before I left, yes. Before I left, yes—I am sorry—but I knew what to do anyway. I am used to doing that work. . . .

"Q. So, at the end of the day, Columbia would give you—

"A. Fill out my time slip.

"Q.—a time slip? Then would you bring that back to Troy?

"A. Yes, sir. . . .

"Q. You went there [to Columbia] on Thursday [the day of the accident], got changed, and then you went upstairs and they told you where you would be working?

"A. Yes. . . .

"Q. Were there supervisors in the kitchen while you were cooking?

"A. No, not over me.

"Q. Not over you, but were they in the area or were they walking around?

"A. They would come by once in a blue [*sic*], once an hour.

"Q. Who did those people work for?

"A. They worked for Columbia."

Finally, Gregory McMillian, the Columbia sous-chef and kitchen manager, testified: "I was Mr. Bellamy's supervisor." McMillian, in his capacity as supervisor, completed and signed a Columbia accident report form for this incident.

The foregoing uncontroverted evidence establishes that a special employment relationship existed between Columbia and plaintiff at the time of the accident. "A special employee is described as one who is transferred for a limited time of whatever duration to the service of another" (*Thompson*, 78 NY2d at 557, citing *Brooks v Chemical Leaman Tank Lines*, 71 AD2d 405, 407 [1979]; *see also Fung v Japan Airlines Co., Ltd.*, 9 NY3d 351, 359 [2007]; *Villanueva v Southeast Grand St. Guild Hous. Dev. Fund Co., Inc.*, 37 AD3d 155, 156 [2007]).

Special employment is demonstrated by evidence of the "surrender of control by the general employer and assumption of control by the special employer" (*Thompson*, 78 NY2d at 557). "[T]he determination of special employment status may be made as a matter of law where the particular, undisputed critical facts compel that conclusion and present no triable issue of fact" (*id.* at 557-558). Which entity "controls and directs the manner, details and ultimate result of the employee's work" is "a significant and weighty" factor in reaching this conclusion (*id.* at 558; *see also Fung*, 9 NY3d at 359; *Lane v Fisher Park Lane Co.*, 276 AD2d 136, 140 [2000] [special employment was established as a matter of law where there was no evidence that the general employer "played any role in supervising or directing plaintiff as she carried out her assignments for the (special employer)"]; *Hanchett v Graphic Techniques*, 243 AD2d 942, 944 [1997] [special employment was established as a matter of law where, although the general employer issued the employee's pay checks, "it did not control, assign, supervise or direct his work once he was sent to" the special employer]).

Based on plaintiff's self-described on-site duties, consistent as his testimony is with the deposition testimony of the representatives of both Troy and defendant, this record leaves not the slightest doubt that plaintiff has failed to raise an inference to support his claim that he was not defendant's special employee. Indeed, while plaintiff was working at Columbia, it was Colum-

bia, not Troy, that "control[led] and direct[ed] the manner, details and ultimate result of [his] work" (*Thompson*, 78 NY2d at 558). Troy could not have been supervising plaintiff, since both plaintiff and Scott, Troy's vice-president, testified that Troy did not send any personnel to supervise its employees' work at client locations. Plaintiff and Scott also testified that, when plaintiff arrived at Columbia, Columbia personnel assigned him specific tasks, told him where to work, supervised his performance, and made sure he cleaned his station before he left. Plaintiff further testified that Columbia provided him with a uniform to wear, including an apron, hat, gloves, and pants. Also, Troy's vice-president testified that a Troy client was not required to seek Troy's approval before asking an employee provided by Troy to work overtime. The Columbia kitchen manager, for his part, testified he was plaintiff's "supervisor" and identified himself as such on the contemporaneous accident report of this incident. Finally, Troy's vice-president testified that it was Columbia, not Troy, that judged the acceptability of plaintiff's work and determined whether he would work for Columbia in the future. This evidence plainly evinces "surrender of control by the general employer and assumption of control by the special employer" (*id.* at 557).

In *Maldonado v Canac Intl.* (258 AD2d 415 [1999]), this Court held that the plaintiff was the defendant's special employee despite being in the general employ of a temporary agency that had the right to hire or fire him and that paid his workers' compensation insurance. Maldonado's employment status as a special employee was instead "established by virtue of [defendant's] comprehensive and exclusive daily control over and direction of plaintiff, and [a] corresponding absence of any supervision or control over the plaintiff's duties by [the general employer]" (*id.*). Here, the record establishes a strikingly similar exercise of control by defendant over plaintiff and a corresponding lack of control by Troy over plaintiff's daily activities.

The uncontroverted evidence of the circumstances of plaintiff's employment in defendant's dining hall leads to the inescapable conclusion that "[p]laintiff's entire, undisputed work environment . . . when all viewed together, demonstrates as a matter of law that [defendant's] responsibility for plaintiff's safety is, and can be, no different from its responsibility for the safety of all its employees" (*Suarez v Food Emporium, Inc.*, 16 AD3d 152, 153 [2005]). Therefore, "[t]here is no reason, based on such uncontested circumstances, to give this special em-

ployee . . . any greater rights to sue [defendant] than all those other employees who equally work under its control" (*id*. at 153-154).

The majority points out, and I agree, that plaintiff's deposition testimony that none of defendant's employees told him how to cook "stands uncontradicted" in the record. This is neither surprising nor determinative, as plaintiff was hired as an experienced cook. The majority also points to plaintiff's testimony that, because he knew how to do his job, Columbia personnel did not supervise him closely (as he put it, "[t]hey weren't breathing down your back"). However, I am not aware of any authority for a view that special employment does not exist unless a defendant establishes any particular type or number of acts manifesting control. Thus, it is inconsequential that plaintiff, when asked whether "anyone from Columbia ever actually t[old] you how to do your job," answered: "No. I knew how to do it." Plaintiff, an experienced cook, had no need for training, but, like other employees, was subject to supervision.[1]

In any event, this aspect of the record does not address the critical inquiry of direction and control. In that regard, plaintiff notably testified that "defendant] told [him] what job [he] would do specifically." As noted above, plaintiff testified that, although Troy assigned him to work at defendant's dining hall, Troy did not send its own people to supervise him there. Once plaintiff reported to work, defendant provided him with a cafeteria uniform in accordance with defendant's dress code, assigned him to a work station, and instructed him as to what he would be doing that day. According to plaintiff, defendant's supervisors were present to ensure the workers, including plaintiff, knew what they were doing. At the end of the day, defendant would fill out plaintiff's time sheet. Plaintiff was not required to ask Troy's permission to work overtime.

The majority also contends that summary judgment on the special employment issue has been granted only where "the defendant's direct control over the plaintiff's work [i]s essentially admitted." Whether or not this characterization of prior decisions is correct (and I am not persuaded that it is), in this case—as is clear from the quoted excerpts of plaintiff's testimony—plaintiff has indeed admitted facts establishing that he worked under Columbia's "direct control." For example,

---

**1.** I find no support in the record for the majority's speculation that Columbia may have subjected plaintiff to a lesser degree of supervision than its general employees having comparable skills.

when asked if it was true that "Troy told you to go to Columbia, and Columbia told you what job you would do specifically," plaintiff replied: *"Yes. You got to listen to the clients, yes"* (emphasis added). Similarly, he testified that, while cooking, he was aware Columbia supervisors were there to "make sure everyone knew what they were doing." These sworn statements by plaintiff himself, in my view, completely put to rest the majority's unsupported assertion that "plaintiff explicitly stated . . . that he was left unsupervised" at Columbia.

Plaintiff's testimony also disposes of the majority's suggestion, through its quotation of *Murray v Union Ry. Co. of N.Y. City* (229 NY 110, 113 [1920]), that a finding of special employment on this record would violate the rule that such a relationship does not exist unless the worker "understand[s] that he is submitting himself to the control of a new master." The above excerpts, quoted verbatim from the record, make clear plaintiff was aware Columbia was supervising his work for it, and that Troy (which did not send any supervisory personnel to Columbia) had relinquished control over plaintiff while he was performing that work. *Murray* is readily distinguishable, because the basis for the result in that case was that the general employer's "representative was, or seemed to be, in continuous authority" over the plaintiff while he was working as a guard on the defendant's railroad (*id.*). In particular, Judge Cardozo's decision notes that, when the *Murray* plaintiff arrived at the premises of the defendant railroad, "he found one of the employees of the [general employer] giving orders to the watchmen, and assigning them to duty" (*id.* at 112). Here, by contrast, no representative of Troy was present at Columbia to supervise or control any of plaintiff's work.

The fact that, as the majority emphasizes, Troy made "the decisions as to where plaintiff was to work from day to day"— i.e., whether to assign plaintiff to Columbia or some other client on a given day—is of no moment. The determination of the special employment issue depends on whether it was the general employer or the alleged special employer that directed and controlled the employee's work for the benefit of the alleged special employer while that work was being performed.[2] Indeed, the general employer initiates every special employment rela-

---

**2.** *See Brown v Bruckner Plaza Assoc.*, 295 AD2d 207, 208 (2002) (worker was special employee where there was "no showing that [the general employer] retained any authority over the work of its laborers *once they were assigned*" to the special employer [emphasis added]); *Lane v Fisher Park Lane*

tionship by "transferr[ing] [the employee] . . . to the service of another" (*Thompson*, 78 NY2d at 557). Thus, if the general employer's initial assignment of the employee to the alleged special employer were sufficient to create a triable issue of special employment, it would never be appropriate to render summary judgment determining that such a relationship existed. This is not the law (*see Maldonado*, 258 AD2d 415 [1999] ["Although plaintiff . . . was assigned by A&A (his general employer) to perform work for defendant Canac . . . plaintiff's status as special employee is established by virtue of Canac's comprehensive and exclusive daily control over and direction of plaintiff, and the corresponding absence of any supervision or control over the plaintiff's duties by A&A"]).

It is neither surprising nor significant that McMillian, the Columbia kitchen manager, when deposed 2½ years after the event, had no specific recollection of plaintiff's duties. What I find important is that McMillian testified, without contradiction, that he "was [plaintiff's] supervisor" the day plaintiff fell. Nor is it significant that plaintiff was assigned to Columbia on a day-to-day basis, rather than for an extended period of time, since special employment exists when an employee "is transferred for a limited time *of whatever duration* to the service of another" (*Thompson*, 78 NY2d at 557 [emphasis added]). Also unavailing is the testimony of Scott, Troy's vice-president, that "Troy would do the discharging" of its employees when that became necessary. It is well settled that the general employer's retention of the right to discharge the employee does not bar a finding of special employment as a matter of law, where the record otherwise warrants such a finding (*see Ramirez v Miller*, 41 AD3d 298 [2007]; *Gannon v JWP Forest Elec. Corp.*, 275 AD2d 231, 232 [2000]; *Maldonado*, 258 AD2d 415 [1999]).[3]

---

*Co.*, 276 AD2d 136, 140 (2000), *supra* (plaintiff was special employee where there was "no showing that [the general employer] played any role in supervising or directing plaintiff *as she carried out her assignments* for the [special employer]" [emphasis added]); *Hanchett v Graphic Techniques*, 243 AD2d 942, 944 (1997), *supra* (worker was special employee where the general employer "did not control, assign, supervise or direct his work *once he was sent to*" the special employer [emphasis added]); *Causewell v Barnes & Noble Bookstores*, 238 AD2d 536 (1997) (plaintiff was defendant's special employee where defendant's "employees exclusively controlled and directed the manner, details, and ultimate result of the plaintiff's work *while on the premises* owned by [defendant] where the accident occurred" [emphasis added]).

3. In any event, while Troy obviously retained the power to determine whether plaintiff would remain its general employee, the record establishes,

The majority states that a customer's assignment of a task to an independent contractor does not turn the independent contractor into an employee of the customer. While I agree with this point as far as it goes, it has no bearing on the outcome of this appeal. Indeed, plaintiff does not claim he was acting as an independent contractor when he donned the uniform Columbia provided him, went to the cooking station Columbia assigned him, and, under the supervision of Columbia personnel, cooked the meals Columbia told him to cook in Columbia's cafeteria. Neither does the majority cite any case in which a worker performing such routine tasks under supervision was held to be acting as an independent contractor. While the majority states that its "point . . . is not that plaintiff was an independent contractor," the point *overlooked* is that, since plaintiff does not deny that he was an employee, some entity must have been directing and controlling his work at Columbia. The record establishes that Troy could not have been, and that Columbia in fact was, playing that role while plaintiff was at Columbia.

I also observe that the majority does not cite any case where a triable issue was held to exist under the Workers' Compensation Law as to whether a temporary worker assigned by a temporary staffing agency to one of the agency's clients was the special employee of the client for the duration of the assignment. While the majority cites two decisions in which the defendant was denied judgment as a matter of law on the special employment issue (*Murray v Union Ry. Co. of N.Y. City,* 229 NY 110 [1920], *supra* [detective agency employee injured while guarding railroad]; *Short v Durez Div.-Hooker Chems. & Plastic Corp.,* 280 AD2d 972 [2001] [refrigeration company employee injured while working at chemical plant]), neither case involved a temporary worker whose general employer was a temporary staffing agency with no involvement (aside from the provision of temporary workers) in the operations of its clients. In *Murray* and *Short,* issues of fact existed whether the general employer continued to direct and control the plaintiff's work while he worked at the premises of the alleged special employer.

and the majority concedes, as previously noted, that it was Columbia that decided whether plaintiff could continue to work on its premises. Further, to the extent the majority questions the competence of the Troy vice-president's testimony, I see no basis to question the Troy vice-president's knowledge that Troy does not supervise its temporary workers while they are working for a Troy client. Moreover, to reiterate, both plaintiff and the Columbia kitchen manager testified that plaintiff worked at Columbia under the supervision of Columbia personnel.

No such question exists here, since it is undisputed that no Troy supervisory personnel were present at the Columbia food service premises while plaintiff was working there.

Several relatively recent decisions by this Court and other departments of the Appellate Division have held that a temporary worker, sent by a temporary staffing agency to work for a client of the agency at a location where the agency has no supervisory personnel, is, as a matter of law, the client's special employee while working under the client's direction and control (*see Roberson v Moveway Transfer & Stor.*, 44 AD3d 839 [2d Dept 2007]; *Suarez v Food Emporium, Inc.*, 16 AD3d 152 [1st Dept 2005], *supra*; *Bailey v Montefiore Med. Ctr.*, 12 AD3d 545 [2d Dept 2004]; *Niranjan v Airweld, Inc.*, 302 AD2d 572 [2d Dept 2003]; *Dyer v We're Assoc.*, 289 AD2d 137 [1st Dept 2001]; *Lane v Fisher Park Lane Co.*, 276 AD2d 136 [1st Dept 2000], *supra*; *Maldonado v Canac Intl.*, 258 AD2d 415 [1st 1999], *supra*; *Hanchett v Graphic Techniques*, 243 AD2d 942 [3d Dept 1997], *supra; Causewell v Barnes & Noble Bookstores*, 238 AD2d 536 [2d Dept 1997], *supra*). None of these cases can, in my judgment, be meaningfully distinguished from the one at bar.

It is puzzling that the majority cites *Bynog v Cipriani Group* (1 NY3d 193 [2003], *modfg* 298 AD2d 164 [2002]), since that decision (in which the Workers' Compensation Law's bar to tort actions was not at issue) actually supports Columbia's position on this appeal. In *Bynog*, the Court of Appeals held that professional waiters employed by a temporary staffing agency (M.J. Alexander & Co., Inc. [MJA]) had no claim under article 6 ("Payment of Wages") of the Labor Law against the operators of the banquet halls (collectively, the Ciprianis) where the waiters had been assigned to work on various occasions. One factor critical to the Court's determination that the waiters were not employees of the Ciprianis was the uncontroverted evidence that the waiters' work at the banquet halls was supervised by MJA, the temporary staffing agency, not by the Ciprianis. The Court stated (1 NY3d at 199):

> "In most cases Alexander [the principal of MJA] attends the banquets and supervises the temporary waiters personally. If he is not in attendance, one of the temporary waiter captains supervises the others.

> "If a problem does arise, the MJA handbook states that the temporary waiter should inform either Mi-

chael Alexander, if he is present, one of his appointed captains if he is not, or simply wait until after the event and report the problems to Alexander. The handbook instructs the temporary waiters not to contact the 'client' directly."

In view of the undisputed evidence that the Ciprianis did not supervise the temporary waiters while they were working at the banquet halls, the *Bynog* Court held: "Even if we were to conclude that the special employment doctrine is applicable in this context and that plaintiffs were the general employees of MJA, the fact remains that the Ciprianis did not exert sufficient control over plaintiffs' performance of their work to render them the special employer of plaintiffs" (*id.* at 200, citing *Thompson,* 78 NY2d at 557).[4] In the instant case, of course, Columbia did precisely what the Ciprianis did not do in *Bynog,* namely, "exert . . . control over [the worker's] performance of [his] work" at the client's facility.

With the undisputed facts of this case and the authority cited as a backdrop, I respectfully suggest that the majority's position would effectively abrogate a settled legal principle. While there are occasions when such a change in the law is appropriate, I do not believe that we, as an intermediate appellate court, have the power in this situation to make the change, especially since the legal principle in question has been so recently reiterated by the Court of Appeals (*see Fung v Japan Airlines Co., Ltd.,* 9 NY3d 351 [2007], *supra*). Even if the course taken by the majority were not foreclosed by the Court of Appeals, I most respectfully submit that the majority has not persuasively demonstrated any recent change in circumstance or any fatal flaw in existing legal doctrine to justify abandoning settled precedent.

Consequently, as plaintiff has elected to receive workers' compensation benefits for his injuries, Columbia, as plaintiff's special employer at the time of his accident, should be shielded from this action at law (*see* Workers' Compensation Law §§ 11, 29 [6]). Accordingly, I would reverse the order on appeal and dismiss the action.

MAZZARELLI and BUCKLEY, JJ., concur with LIPPMAN, P.J.; FRIEDMAN and MARLOW, JJ., dissent in a separate opinion by MARLOW, J.

---

4. The quoted language from *Bynog* demonstrates that the Court of Appeals did not determine that the special employment doctrine applied in the context of that case, nor did the Court determine that the waiters were general employees (as opposed to independent contractors) of MJA. Again, plaintiff in this case does not claim to have been an independent contractor.

Order, Supreme Court, Bronx County, entered January 25, 2007, affirmed, without costs.