■ WILLIAM BAUTISTA, Appellant, v DAVID FRANKEL REALTY, INC., Respondent. [863 NYS2d 638]—

Order, Supreme Court, New York County (Debra A. James, J.), entered on or about April 25, 2007, which granted defendant's motion for summary judgment dismissing the complaint, reversed, on the law, without costs, the motion denied and the complaint reinstated.

Plaintiff, who worked as a porter at a building owned by 55 East 66th Street Corporation (the Corporation), fell from a lad-

der while painting an exterior staircase of the building. Plaintiff commenced this action against defendant, the managing agent of the building, asserting causes of action under Labor Law §§ 200, 240 (1) and § 241 (6). Defendant moved for summary judgment dismissing the complaint on the ground that plaintiff, who received workers' compensation benefits from his employer, the Corporation, was defendant's special employee and thus this action is barred by the exclusive remedy provisions of the Workers' Compensation Law. Defendant also asserted that it was entitled to summary judgment because plaintiff's own actions were the sole proximate cause of his injuries. Supreme Court granted the motion on the ground that plaintiff was defendant's special employee, and this appeal by plaintiff ensued.

"[A] general employee of one employer may also be in the special employ of another, notwithstanding the general employer's responsibility for payment of wages and for maintaining workers' compensation and other employee benefits. A special employee is described as one who is transferred for a limited time of whatever duration to the service of another. General employment is presumed to continue, but this presumption is overcome upon clear demonstration of surrender of control by the general employer and assumption of control by the special employer" (*Thompson v Grumman Aerospace Corp.*, 78 NY2d 553, 557 [1991] [citations omitted]). Essential to a special employment relationship "is a *working* relationship with the injured plaintiff sufficient in kind and degree so that the [putative special employer] may be deemed plaintiff's employer" (*Fung v Japan Airlines Co., Ltd.*, 9 NY3d 351, 359 [2007]). Notably, "a 'significant' and 'weighty feature' in deciding whether a special employment relationship exists is 'who controls and directs the manner, details and ultimate result of the employee's work'—in other words, who determines 'all essential, locational and commonly recognizable components of the [employee's] work relationship' " (*id.*, quoting *Thompson*, 78 NY2d at 558). The question of whether a special employment relationship exists is fact-laden and generally presents an issue for the trier of fact (*see Thompson*, 78 NY2d at 557; *Bellamy v Columbia Univ.*, 50 AD3d 160 [2008]).

In support of its motion, defendant submitted the management agreement between it and the Corporation, pursuant to which the Corporation retained defendant to perform certain services at the building. The agreement stated that, while defendant was responsible for "[c]aus[ing] to be hired, paid and supervised, all persons necessary . . . to properly maintain and operate the [building]," the persons so hired would be the em-

ployees of the Corporation, not defendant. The agreement also stated that defendant was responsible for "[c]aus[ing] the Building to be maintained in such condition as may be directed by [the Corporation]."

Defendant also submitted the deposition testimony of plaintiff and the superintendent of the building, Albert Abreu. Plaintiff testified that he had been hired by the Corporation and that entity paid his wages. Plaintiff also testified that the only person he reported to and received assignments from was Abreu, who directed plaintiff to paint the staircase on the morning of the accident.

While Abreu testified that he was hired and employed by defendant, he also testified that he was paid by the Corporation and that his W-2 forms listed that entity as his employer. Moreover, defendant's counsel tacitly conceded in defendant's reply papers before Supreme Court that Abreu was employed by the Corporation. Abreu lived in the building and was responsible for supervising the seven other men who worked in the building, including plaintiff. Specifically, Abreu stated that "[m]y duties were to oversee that each man did [his] job; they had certain routines to do, and I would follow through and make sure these duties were done. I would give them specific instructions, and that was mainly it."

Abreu also testified that he would speak to Suz Landi, an employee of defendant who served as the property manager of the building, approximately three times per week. Every Wednesday, Abreu would report to defendant's office and meet with Landi to "drop off the payroll" and review purchase orders, tenants' requests and complaints, and proposals from contractors to perform work at the building. Abreu would speak on the telephone with Landi approximately two other days per week to review the status of projects at the building and tenants' requests and complaints. Notably, Abreu answered "yes" to the following question: "Would you deal with, as best as you could, *on your own, in the autonomous position that you had,* the complaints and requests of the . . . tenants?" (emphasis added). Relatedly, the following colloquy occurred between counsel for plaintiff and Abreu:

"Q: Were you, with respect to your duties as the [superintendent], pretty much autonomous in your position? Would you like me to explain that? I don't want to use a phrase that you might not be comfortable with. You were the boss of everyone else there; is that a fair statement?

"A: Yes, it is.

"Q: You told the other employees what to do?

"A: That is correct.

"Q: What you told them to do is based upon, not only your title, but your experience as someone who had been in the business a good part of your life?

"A: Yes. . . .

"Q: So, is it fair to say that, for example, in 2004, you had a pretty set schedule, and pretty firm understanding of what you wanted the other . . . employees to do?

"A: Yes. . . .

"Q: You would certainly know what to do, unless it was some extraordinary request or complaint; is that a fair statement?

"A: Yes, it is."

While Abreu testified as to his interaction with Landi and delineated what he and Landi would discuss when they spoke, Abreu never testified that Landi instructed him as to what tasks to perform, let alone how to perform them.

Defendant also relied on the affidavit of Landi, who averred that she was Abreu's supervisor and "[i]n that capacity, [she] assigned, supervised, instructed, oversaw, monitored and directed [Abreu's] work duties on a daily basis." Landi further averred that "plaintiff reported directly to . . . Abreu[, who] assigned, supervised, instructed, oversaw, monitored and directed . . . plaintiff's work duties on a daily basis." Thus, according to Landi, defendant "directed [Abreu], who in turn directed the maintenance staff and gave them their daily assignments." Landi concluded that defendant "had comprehensive and exclusive daily control over the work of all the maintenance staff of the . . . building through the building's superintendent [i.e., Abreu]. Defendant had the authority and exercised the right to control all facets of the daily operation of the building and its workers."

Defendant's assertion that plaintiff was its special employee rests on its claim that, as the managing agent of the building, it controlled Abreu's work and Abreu in turn controlled plaintiff's work. The evidence adduced by defendant in support of its motion established that Abreu controlled plaintiff's work. Thus, the resolution of this appeal turns on whether a triable issue of fact exists regarding whether defendant controlled Abreu's work. We conclude that such an issue does exist.

Even assuming the affidavit of Landi would otherwise be sufficient to satisfy defendant's burden on its motion, that affidavit is undermined by Abreu's deposition testimony, which demonstrates the existence of a triable issue of fact with respect to whether defendant controlled and directed the manner, details

and ultimate result of Abreu's work. Abreu gave no testimony to the effect that defendant instructed him to paint the staircase, let alone that defendant dictated to him the manner in which that task was to be performed. In fact, Abreu gave no testimony to the effect that defendant controlled and directed the manner and details of his work generally. To the contrary, Abreu testified that he had autonomy in performing his job and supervising the men who worked at the building; the precise extent of that autonomy is not clear from the record, precluding us from determining *as a matter of law* whether defendant controlled and directed the manner, details and ultimate result of Abreu's work.

We disagree with our dissenting colleague's conclusion that, because Abreu referred to Landi as his "boss" and the Merriam-Webster's Collegiate Dictionary defines "boss" as "a person who exercises control or authority; *specifically*: one who directs or supervises workers," Abreu's deposition testimony that he had autonomy in performing his job and supervising the men who worked at the building does not demonstrate the existence of a triable issue of fact. The dictionary definition of the word "boss" is not synonymous with the legal term of art "special employer." That Landi exercised general supervisory authority over Abreu from time to time is not sufficient to establish, as a matter of law, that defendant was Abreu's special employer; "a significant and weighty feature in deciding whether a special employment relationship exists is who controls and directs *the manner, details and ultimate result of the employee's work*" (*Fung*, 9 NY3d at 359 [internal quotation marks omitted and emphasis added]).

*Villanueva v Southeast Grand St. Guild Hous. Dev. Fund Co., Inc.* (37 AD3d 155 [2007]), on which the dissent relies, is distinguishable. In *Villanueva* the plaintiff, an employee of a building that defendant management company managed pursuant to an agreement with the building's owner, was injured when he fell from a ladder while working at the building. The plaintiff commenced an action to recover damages against, among others, the management company, and the management company moved for summary judgment dismissing the complaint as against it on the ground that the plaintiff was its special employee. In determining that the management company made a prima facie showing of entitlement to judgment as a matter of law, we noted that the affidavit of the management company's president "established that [the management company] was exclusively responsible for the maintenance and repair of the premises" (*id.* at 156). Our determination in *Villanueva* that

the management company made a prima facie showing that it was the plaintiff's special employer also rested in part on deposition testimony by the management company's president that "he supervised maintenance employees and the superintendent and manager at the premises" (*id.*). Moreover, under the management agreement, the superintendent, who supervised the work plaintiff was performing at the time of his accident, was an employee of the management company (*id.* at 156-157).

Here, however, as noted above, Abreu testified that he had autonomy in performing his job and supervising the men who worked at the building. Additionally, albeit not decisively, contrary to the agreement in *Villanueva* the management agreement between defendant and the Corporation expressly states that maintenance personnel are the employees of the Corporation, not defendant.[1]

Our dissenting colleague believes that, in addition to *Ramirez v Miller* (41 AD3d 298 [2007], *lv dismissed* 10 NY3d 784 [2008]), *Ayala v Mutual Hous. Assn., Inc.* (33 AD3d 343 [2006]), *Erazo v 136 E. Mgt.* (302 AD2d 282 [2003]) and *Brunetti v City of New York* (286 AD2d 253 [2001]) compel the conclusion that summary judgment must be granted to defendant. To be sure, each of these decisions holds that the defendant was entitled to summary judgment dismissing the complaint as against it on the ground that it was the plaintiff's special employer. The absence of triable issues of fact on the issue of special employment in these cases, however, certainly does not mean that no triable issue of fact exists in this case; the issue of whether a worker is the special employee of a putative special employer is a "highly fact-sensitive" inquiry (*Bellamy*, 50 AD3d at 169). In light of Abreu's testimony that he exercised autonomy (the extent of which cannot be discerned on this record) in performing his job and supervising the men who worked at the building—and the absence of any indication in any of the decisions relied upon by our dissenting colleague of similar evidence in those cases—we conclude that those cases do not control the outcome of this appeal (*see Matter of Seelig v Koehler*, 76 NY2d 87, 92 [1990] [distinguishing prior decisions and observing that "the identification and weighing of all the unique and particular facts of each case governs"], *cert denied* 498 US 847 [1990]; *Roosa v Harrington*, 171 NY 341, 350 [1902] ["each case, as it arises,

---

1. Of course, the presence of this provision is not dispositive on the issue of whether defendant was plaintiff's special employer (*see Thompson*, 78 NY2d at 559). Such a provision, however, contrary to the assertion of our dissenting colleague, is a factor that we must consider in determining whether a triable issue of fact exists on that score.

must be viewed and decided according to its own particular facts and circumstances, and will become a controlling precedent, only, where the facts are the same"]). Needless to say, we regret that our dissenting colleague believes we evince a "breathtaking disregard" for precedent and seek to "conjure" a triable issue of fact.

In short, because this Court has determined in other cases that a particular building manager was the special employer of a particular employee of a building it hardly follows that defendant is, as a matter of law, the special employer of plaintiff. To so hold would be to adopt a rule that affords all building managers the status of special employers of the employees of the buildings the building managers operate. Such a rule would offend the well-settled principle that the title of the putative special employer, e.g., a managing agent, is not controlling, but rather the actual working relationship between the putative special employer and the purported special employee (*Fung*, 9 NY3d at 360).

With respect to the conclusion of our dissenting colleague that defendant is entitled to summary judgment, we note that, even assuming that a reasonable inference can be drawn that defendant controlled and directed the manner and detail of Abreu's work and thus that defendant controlled and directed the manner and detail of plaintiff's work, that inference is not the *only* reasonable inference that can be drawn from the record. Rather, a reasonable inference also can be drawn that defendant did not control and direct the manner and detail of Abreu's work and concomitantly that defendant did not, through Abreu, control and direct the manner and detail of plaintiff's work. Stated differently, a reasonable inference can be drawn that Abreu, an employee of the Corporation, exercising the autonomy he had in doing his job and supervising the men, controlled and directed the manner and detail of plaintiff's work.[2] In light of the principles that general employment is presumed to continue and the question of whether a special employment relationship exists is generally one for the trier of

---

**2.** To answer our dissenting colleague's query regarding who, if not Landi, controlled Abreu's work, one need only look to the well-established rule that, absent a clear showing of the surrender of control by the general employer *and the assumption of sufficient control by the special employer*, general employment is presumed to continue. Moreover, our dissenting colleague implicitly assumes that Abreu's work always was controlled by someone, i.e., Landi. As is indicated by Abreu's testimony about the autonomy he sometimes exercised, that simply is not so. Furthermore, defendant must establish that it affirmatively exercised sufficient control over Abreu (*see Thompson*, 78 NY2d at 557; *Sanfilippo v City of New York*, 239 AD2d 296 [1997]).

fact, and the requirement that we draw all reasonable inferences in favor of the party opposing summary judgment (*see Henderson v City of New York*, 178 AD2d 129, 130 [1991]; *see also Sodexho Mgt., Inc. v Nassau Health Care Corp.*, 23 AD3d 370, 371 [2005]), defendant failed to demonstrate its entitlement to judgment as a matter of law.

Defendant also asserts that "the delegation [pursuant to the management agreement] by the [Corporation] to [defendant] of the exclusive management and control of the building . . . constitutes the requisite degree of control" necessary to create a special employment relationship between plaintiff and defendant. First, plaintiff was not a party to the management agreement and the agreement "does not purport to define or resolve the issue of [plaintiff's] special employment status" (*Thompson*, 78 NY2d at 560). The agreement, therefore, regardless of its terms, is not determinative of the issue of whether plaintiff was defendant's special employee (*id.*). Second, assuming defendant did have the exclusive right to manage and control the building, such a right standing alone would be insufficient to support summary judgment in defendant's favor. To rebut the presumption of general employment the putative special employer must clearly demonstrate that the general employer surrendered control over the employee *and that the putative special employer assumed such control* (*Thompson*, 78 NY2d at 557; *see Sanfilippo, supra*). Here, as discussed above, defendant failed to demonstrate clearly that it assumed complete and exclusive control over Abreu and thus failed to demonstrate that it assumed complete and exclusive control over plaintiff.

At bottom, we hold only that, under the particular facts of this case, defendant failed to make a prima facie showing that it was plaintiff's special employer. Of course, defendant *may* have been plaintiff's special employer and our dissenting colleague has marshaled arguments in support of that conclusion. Our function at this juncture, however, is not to decide an issue of fact but to determine whether one exists (*see Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957] ["issue-finding, rather than issue-determination, is the key to (reviewing a motion for summary judgment)" (internal quotation marks and citation omitted)]). Since defendant failed to make a prima facie showing of entitlement to judgment as a matter of law, its motion must be denied regardless of the sufficiency of plaintiff's opposition (*see Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]).

Defendant's contention that it is entitled to summary judgment on the ground that plaintiff's actions were the sole

proximate cause of his injuries is without merit. "Where a plaintiff's actions are the sole proximate cause of his injuries, liability under Labor Law § 240 (1) does not attach. Instead, the owner or contractor must breach the statutory duty under section 240 (1) to provide a worker with adequate safety devices, and this breach must proximately cause the worker's injuries. These prerequisites do not exist if adequate safety devices are available at the job site, but the worker either does not use or misuses them" (*Robinson v East Med. Ctr., LP*, 6 NY3d 550, 554 [2006] [internal quotation marks, citations and ellipsis omitted]). As defendant submitted no evidence that adequate safety devices were available to plaintiff or that plaintiff was directed to use such devices, it failed to make a prima facie showing that plaintiff's actions were the sole proximate cause of his injuries (*see Ferluckaj v Goldman Sachs & Co.*, 50 AD3d 359, 362 [2008]; *Balbuena v New York Stock Exch., Inc.*, 49 AD3d 374, 375-376 [2008]; *see also De Jara v 44-14 Newtown Rd. Apt. Corp.*, 307 AD2d 948, 950 [2003]; *cf. Cahill v Triborough Bridge & Tunnel Auth.*, 4 NY3d 35, 39-40 [2004]).

Defendant's argument that it is entitled to summary judgment dismissing plaintiff's cause of action under Labor Law § 240 (1) on the ground that plaintiff was not engaged in an activity protected by that statute was not raised before Supreme Court and we decline to consider it. Concur—Gonzalez, McGuire and Moskowitz, JJ.

Friedman, J.P., dissents in a memorandum as follows: As set forth later in this dissent, this Court has considered the issue of special employment in the building management context in at least eight recent decisions. In those cases, decided by benches that included members of the present majority, we found that a special employment relationship between the defendant managing agent and the plaintiff employee had been established as a matter of law. With breathtaking disregard for our precedents, the majority declines to follow these decisions without making a serious effort to distinguish them factually, while failing to cite a single decision of this Court in which a triable issue as to special employment was held to exist on a comparable record. The foregoing is all the more remarkable because plaintiff has presented no evidence to controvert defendant's evidence that a special employment relationship existed between the parties.

Plaintiff, a porter at a residential building owned by nonparty 55 East 66th Street Corporation (55 East), suffered an on-the-job injury, for which he collected workers' compensation benefits. It is undisputed that 55 East was the general employer of the building staff, including plaintiff and the building super-

intendent, plaintiff's "boss." The record also contains uncontroverted evidence establishing that the entity 55 East hired to act as the building's managing agent—defendant David Frankel Realty, Inc. (DFR)—was the "boss" of plaintiff's boss, the building superintendent (as the latter testified), and that DFR, pursuant to its contract with 55 East, made decisions concerning the hiring and firing of members of the building staff and otherwise "control[led] and direct[ed] the manner, details and ultimate result of the . . . work" of the building staff, including plaintiff (*Fung v Japan Airlines Co., Ltd.*, 9 NY3d 351, 359 [2007], quoting *Thompson v Grumman Aerospace Corp.*, 78 NY2d 553, 558 [1991]). Although plaintiff has not come forward with an iota of evidence rebutting DFR's proof that he was DFR's special employee, the majority holds that Supreme Court erred in dismissing this action against DFR pursuant to the bar of Workers' Compensation Law §§ 11 and 29 (6). Because I believe that the majority's decision is contrary to well-settled law, I respectfully dissent.

The majority agrees with me that, contrary to plaintiff's contentions, the record establishes that the building superintendent, Albert Abreu—whom plaintiff described as his "boss" and his "supervisor"—controlled plaintiff's work. The majority and I also agree that, if DFR, the managing agent, was the special employer of Abreu, plaintiff's supervisor, then DFR also would have to be deemed plaintiff's special employer, consistent with prior decisions this Court has rendered in cases with similar fact patterns (*see Ramirez v Miller*, 41 AD3d 298, 298-299 [2007], *lv dismissed* 10 NY3d 784 [2008]; *Ayala v Mutual Hous. Assn., Inc.*, 33 AD3d 343, 344 [2006]; *Erazo v 136 E. Mgt.*, 302 AD2d 282 [2003]; *Brunetti v City of New York*, 286 AD2d 253 [2001]). Where the majority and I disagree is on whether the record establishes that Abreu, although a general employee of 55 East, was himself a special employee of DFR. In my view, the evidence set forth below—which has not been disputed or controverted in any way by plaintiff—eliminates any triable issue as to the relationship between Abreu and DFR. Plainly, Abreu was a special employee of DFR.

Abreu's testimony about his relationship with DFR was clear enough. Abreu testified that he "*had* to appear at [DFR's] office on Wednesday" each week, at which time he would "report to [his] *boss*" (emphasis added), a DFR vice-president named Suz Landi. Abreu testified that, when he went to his Wednesday meetings with Landi at DFR, he would "bring purchase orders" and "reports of tenants' questions," "bring over proposals from contractors," "drop off the payroll," and "report to [Landi] the

existing overall problems in the building." In addition, Abreu filed a report about plaintiff's accident with Landi at DFR, which he said was "mandatory."

In her affidavit in support of DFR's motion for summary judgment, Suz Landi averred:

"[DFR] is a managing agent for numerous residential apartment buildings in New York City including the building located at 55 East 66th Street, New York, New York. That building is owned by [55 East]. I am the property manager for the apartment building owned by [55 East]. . . .

"In my capacity as property manager for 55 East 66th Street, I was the direct supervisor of Albert Abreu, the superintendent of the apartment building on June 3, 2004 [the date of plaintiff's accident]. In that capacity, I assigned, supervised, instructed, oversaw, monitored and directed his work duties on a daily basis.

"The plaintiff herein was a porter in the building. The plaintiff reported directly to Mr. Abreu. Albert Abreu assigned, supervised, instructed, oversaw, monitored and directed the plaintiff's work duties on a daily basis.

"[DFR], the managing agent, hired, supervised and paid the maintenance staff, and terminated workers if necessary. The managing agent directed the superintendent, who in turn directed the maintenance staff and gave them their daily assignments.

"[DFR] collected maintenance payments from shareholders and paid the workers wages from the building account; provided the plaintiff's paycheck, carried workers compensation, liability and unemployment insurance, and withheld Social Security.

"[DFR] had comprehensive and exclusive daily control over the work of all the maintenance staff of the apartment building through the building's superintendent. [DFR] had the authority and exercised the right to control all facets of the daily operation of the building and its workers.

"The maintenance people were not directly supervised or directed by [55 East]."

The management agreement between DFR and 55 East provided, inter alia, that DFR would "[c]ause to be hired, paid and supervised, all persons necessary or desirable in order to properly maintain and operate the Premises who, in each instance, shall be [55 East's] and not [DFR's] employees, and cause to be discharged all persons unnecessary or undesirable." The management agreement also provided that DFR would "[c]ause the Building to be maintained in such condition as may be directed by [55 East]."

Special employment is demonstrated by evidence of the "surrender of control by the general employer and assumption of control by the special employer" (*Thompson*, 78 NY2d at 557). "[A] 'significant' and 'weighty feature' in deciding whether a special employment relationship exists is 'who controls and directs the manner, details and ultimate result of the employee's work'—in other words, who determines 'all essential, locational and commonly recognizable components of the [employee's] work relationship' " (*Fung*, 9 NY3d at 359, quoting *Thompson*, 78 NY2d at 558). Another principal factor in the analysis is which entity holds the power of "hiring and discharging" the employee (*Fung*, 9 NY3d at 359, citing *Ugijanin v 2 W. 45th St. Joint Venture*, 43 AD3d 911, 913 [2007]). The general employer's retention of "responsibility for payment of wages and for maintaining workers' compensation and other employee benefits" is not inconsistent with the existence of a special employment relationship (*Thompson*, 78 NY2d at 557). Further, "the determination of special employment status may be made as a matter of law where the particular, undisputed critical facts compel that conclusion and present no triable issue of fact" (*id.* at 557-558).

In this case, DFR made a prima facie showing that it was the special employer of Abreu, plaintiff's supervisor, and therefore the special employer of plaintiff himself, notwithstanding that 55 East, which paid both men's wages, was their general employer. Abreu testified that his "boss" was Suz Landi, the DFR vice-president who served as the property manager of the building, and that he was required to file a report about plaintiff's accident with Landi. That DFR directed and controlled the work of the building staff is confirmed by Landi's affidavit, as well by the management agreement between 55 East and DFR, which gave DFR the power and responsibility to hire, fire, and supervise 55 East's employees engaged in the maintenance and operation of the building. Since plaintiff has not come forward with any countervailing evidence, DFR is entitled to summary judgment dismissing the complaint as barred by the Workers' Compensation Law.

The conclusion that the record establishes that DFR was plaintiff's special employer is consistent with numerous decisions this Court has rendered in the building management context, in which we have held that a managing agent with the undisputed power to hire, fire and supervise the building staff is the special employer of the staff members as a matter of law (*see Gomez v Penmark Realty Corp.*, 50 AD3d 607 [2008]; *Ramirez v Miller*, 41 AD3d 298 [2007], *supra*; *Villanueva v*

*Southeast Grand St. Guild Hous. Dev. Fund Co., Inc.*, 37 AD3d 155 [2007]; *Ayala v Mutual Hous. Assn., Inc.*, 33 AD3d 343 [2006], *supra*; *Gherghinoiu v ATCO Props. & Mgt., Inc.*, 32 AD3d 314 [2006], *lv denied* 7 NY3d 716 [2006]; *Hughes v Solovieff Realty Co., L.L.C.*, 19 AD3d 142 [2005]; *Erazo v 136 E. Mgt.*, 302 AD2d 282 [2003], *supra*; *Evans v Citicorp*, 276 AD2d 370 [2000]). The majority fails to identify a single precedent of this Court decided in the building management context that supports the result it reaches here.

Contrary to the majority's claim, I do not propose that we adopt a rule under which "all building managers [are afforded] the status of special employers of the employees of the buildings the building managers operate." I do, however, believe that we should adhere to this Court's own precedents holding that clear and uncontroverted evidence that a building manager directed and supervised the building staff—such as we have in the record before us—establishes the existence of a special employment relationship between the building manager and the building staff as a matter of law. The majority departs from this line of precedent without explanation or justification.

While basically ignoring the foregoing case law, the majority asserts that Abreu's deposition testimony somehow creates an issue of fact as to whether DFR was his special employer. This position is baffling. Abreu, without any prompting by the lawyer examining him, characterized Landi of DFR as his "boss," a common English word defined as "a person who exercises control or authority; *specifically*: one who directs or supervises workers" (Merriam-Webster's Collegiate Dictionary 133 [10th ed]). Abreu further testified that he was required to "report" to Landi once a week to discuss all aspects of the building's operations, and that he was required to file a report about plaintiff's accident with Landi. If more than this uncontroverted evidence were needed, it is certainly supplied by the description of DFR's authority over the building's staff in Landi's affidavit, and by DFR's management agreement, which gave DFR the power and responsibility to hire, pay, supervise and discharge all members of the building staff. Not a word of Abreu's testimony contradicts the picture of the extent of DFR's authority given by Landi's affidavit and the management agreement.

While the majority gives short shrift to Landi's affidavit, that affidavit is no less factually detailed than the affidavits on which this Court granted special employers summary judgment in two prior unanimous decisions in which a member of the majority of the instant panel participated.

In *Villanueva v Southeast Grand St. Guild Hous. Dev. Fund*

*Co., Inc.* (*supra*), we granted the defendant management company (Residential) summary judgment on the special employment issue based on the affidavit of its president (John Cameron). We found that Cameron's affidavit "established that [Residential] was exclusively responsible for the maintenance and repair of the premises" (37 AD3d at 156). The relevant portions of Cameron's affidavit read as follows (paragraph numbers omitted):

"That at the time of the accident herein, as per the management agreement, Residential . . . was exclusively responsible for the maintenance and repair of the premises . . . . The site superintendent . . . and the site manager . . . were employed by [the owner] but they and all of the other site employees reported directly to and were supervised by myself at the time of the accident herein.

"That the site owner . . . had no direct involvement in the day-to-day operation, control, maintenance and supervision of the premises at the time of the accident herein.

"That Residential . . . and myself had the ultimate authority and responsibility for the hiring, disciplining and/or firing of site personnel at the time of the accident herein."

Similarly, in *Gherghinoiu v ATCO Props. & Mgt., Inc.* (*supra*), we granted the defendant managing agent of a property summary judgment on the special employment issue based on the affidavit of its treasurer, Leonard Bernacke (32 AD3d at 315). The entire discussion of direction and control over the plaintiff's work in Bernacke's affidavit was as follows: "That though [the owner] was listed as the plaintiff's employer, it was the employees and/or executives of [the managing agent] that utilized, directed and controlled the manner and methods of [the owner's] maintenance workers, including the plaintiff. Further, it was solely [the managing agent] that had the ability to hire and/or fire the maintenance workers that worked at [the property]" (paragraph number omitted). Notably, the record of the *Gherghinoiu* decision does not contain any deposition transcript, indicating that our holding on the special employment issue in that case was based entirely on the Bernacke affidavit.

If we were correct in rendering summary judgment on the special employment issue in *Villanueva* and *Gherghinoiu* based on the above-quoted affidavits, I do not understand why we should not rely on the Landi affidavit (to the extent such reliance may be necessary) in affirming the grant of summary judgment on the special employment issue in this case.

I see no merit in the majority's suggestion that *Villanueva* can be distinguished from this case based on the provision in

DFR's management agreement that members of the building staff "shall be [55 East's] and not [DFR's] employees." Although the majority concedes that this provision is not "decisive[ ]" of the special employment issue, it would be more accurate to say that the provision is essentially irrelevant. In addressing a similar contractual provision in the seminal decision on this issue, the Court of Appeals stated: "While the ATS-Grumman contract provides that ATS is to be considered Thompson's employer, that provision alone is insufficient to establish as a matter of law that Thompson was *not* also a special employee of Grumman. Moreover, in the context of this record, it fails to raise a question of fact as to his special employment status" (*Thompson*, 78 NY2d at 559). This Court, following *Thompson*, held to the same effect in *Maldonado v Canac Intl.* (258 AD2d 415 [1999]): "Even if the contract . . . provided that employees of A&A assigned to work under Canac's direction 'shall at all times be employees of A&A and not of Canac', the application of the law as set forth in *Thompson v Grumman Aerospace Corp. (supra)* would still require that summary judgment be granted to the special employer [Canac]." In addition, the record of our 2007 decision in *Ramirez v Miller (supra)* shows that the building management agreement in that case contained a provision substantially identical to the one here, requiring the managing agent to "[c]ause to be hired, paid and supervised, all persons necessary to be employed in order to properly maintain and operate the Building, *who, in each instance, shall be the Owner's and not the Agent's employees*, and cause to be discharged all persons unnecessary or undesirable" (emphasis added). Consistent with *Thompson* and *Maldonado*, we affirmed summary judgment for the managing agent on the special employment issue in *Ramirez* notwithstanding the above-quoted contractual provision.

In the end, the sole basis for the majority's attempt to conjure a triable issue out of the simple and undisputed facts of this case is Abreu's affirmative answer to a clumsily constructed question by plaintiff's counsel that included the assertion that Abreu held an "autonomous position." That Abreu, as the resident building superintendent, exercised some degree of autonomy in carrying out his day-to-day duties is neither surprising nor in any way inconsistent with his having been a special employee of DFR. Far from claiming to be an independent contractor, Abreu referred to Landi as his "boss"; he acknowledged that he filed his income tax returns with a W-2 form; and—most tellingly—he initially testified that it was his

understanding that he was "employed by [DFR]."* Since it is undisputed Abreu was an employee—one who works subject to the direction and control of another—some entity must have exercised that direction and control. The only entity the record evidence identifies as exercising direction and control over Abreu is DFR, through Landi. In other words, if the majority is correct that a reasonable inference could be drawn that Landi was not controlling Abreu's work, the question is, who was? Plaintiff has offered nothing to show that Abreu's work was controlled by someone other than Landi, and certainly has not come forward with a sliver of evidence to show that Abreu reported to any officer or employee of 55 East, the general employer. Indeed, neither plaintiff nor the majority identifies any evidence in the record that would support an inference that Abreu (and, therefore, plaintiff) was *not* a special employee of DFR.

In view of the majority's focus on Abreu's exercise of some autonomy in carrying out his day-to-day duties, it should also be noted that a person's having some degree of autonomy in performing his job is not inconsistent with his being subject to another's control for purposes of employment law. For example, a medical resident treating patients at a hospital, an associate attorney conducting a deposition, a police officer on patrol, and a foreman at a factory are all considered employees. Thus, in asking who, if not Landi, was controlling Abreu's work, I do not make the inapt assumption the majority apparently ascribes to me that some supervisor had to be constantly hovering over Abreu as he performed his job. As a person who held a position of some responsibility, Abreu presumably performed his job without an overseer looking over his shoulder every minute, but this does not mean that no one had "control" over his work within the contemplation of *Thompson* and its progeny.

For the foregoing reasons, I believe that plaintiff's action against DFR is barred by the Workers' Compensation Law, and, on that ground, I would affirm Supreme Court's grant of summary judgment dismissing the complaint. I therefore find it unnecessary to reach the parties' remaining arguments.

---

* It is striking that the majority completely ignores Abreu's testimony that his own understanding was that DFR was his employer. While Abreu subsequently acknowledged that 55 East was his employer after it was brought to his attention that 55 East signed his paychecks and issued his W-2 form, not a word of his testimony casts doubt on DFR's authority over his work.